## SOMERS and Another *v.* PUMPHREY and Others.

DEED OF INSANE PERSON.—The deed of a person of unsound mind, not under guardianship, conveys a seizin to the grantee; such deed being voidable only, and not void. Page 234.

WEAKNESS OF MIND.—Mere weakness of mind is not idiocy or insanity, nor does it amount to unsoundness of mind, within the meaning of the law, and such weakness is not enough, of itself, to avoid a deed. Page 235.

FRAUD.—A deed procured by the fraud of the grantee is not void, but voidable only, and conveys a seizin, which, in the hands of an innocent purchaser, without notice, may become a good title. Page 236.

INSTRUCTIONS.—It is error for the court to give to the jury instructions which are inconsistent with each other, and which leave the jury in doubt which to believe. Page 237.

INSANE PERSONS—CONTRACTS OF.—The deed of a person of unsound mind may be avoided by the grantor himself, or his legal representatives, though the estate may have passed into the hands of a *bona fide* purchaser for a valuable consideration. Page 238.

DEED—DELIVERY OF.—Ordinarily, the question as to the delivery of a deed is one of fact, to be determined by the jury, but it may arise in a form to present only a question of law for the court, or it may present a mixed question of law and fact, in which case the jury determines the facts, and the court the law arising upon the facts as proved. Page 239.

SAME.—The law does not prescribe any particular form of words or actions as necessary to constitute a delivery. Anything done by the grantor, from which it is apparent that a delivery is thereby intended, either by words or acts, or both combined, is sufficient. Page 239.

SAME.—An actual delivery by the husband to the grantee, of a deed executed by the husband and wife, of the wife's land, will, in the absence of fraud, be deemed a delivery by the wife also. Page 243.

SAME.—LEAVING DEED FOR RECORD.—The leaving of a deed for record at the recorder's office, by the grantor, is at least a *prima facie* delivery to the grantee; such act being regarded by the law as an unconditional delivery to a third person for the use of the grantee. Page 243.

IMBECILITY.—Imbecility of mind is not sufficient to set aside a contract, where there is not an essential privation of the reasoning faculties, or an incapacity of understanding and acting with discretion in the ordinary affairs of life. The law cannot undertake to measure the validity of contracts by the greater or less strength of the understanding; and if the party be *compos mentis*, the mere weakness of his mental powers does not incapacitate him. Page 246.

APPEAL from the *Franklin* Circuit Court

ELLIOTT, C. J.—On the 19th of *June*, 1844, *Silas Pumphrey*, being seized of the north-west quarter of section 8, in township 13, in range 13, east, situate in *Fayette* county, *Indiana*, conveyed the same by deed, in fee, to his daughters, *Elizabeth Pumphrey* and *Jane Pumphrey*, jointly; in consideration of which the said *Elizabeth* and *Jane* executed to him their joint note for the sum of $1200.

In the year 1845, *Elizabeth Pumphrey* intermarried with *Golvin Somers*, sen. Afterward, in 1846, *Silas Pumphrey* demanded of *Golvin Somers*, and his wife *Elizabeth*, payment of one-half of the note executed to him by the said *Elizabeth* and *Jane* for $1200. *Golvin Somers*, the husband, paid the $600 to *Pumphrey*. *Elizabeth* brought no other estate to her husband than her interest in the land conveyed to her by her father, and for the purpose of re-imbursing him the $600, paid on the note to her father, on the 15th of *June*, 1846, for the purpose of having her interest in the land vested in her husband, she joined with him in a deed conveying her interest, in fee, to one *John Stineman*, who, on the next day, re-conveyed the same, by deed, to the said *Golvin Somers*. Both of these deeds acknowledge a valuable consideration, but, in truth, none was paid on either side. They were regularly acknowledged before a justice of the peace, and recorded in the recorder's office of *Fayette* county, on the 1st day of *July*, 1846.

On the 14th of *February*, 1856, *Golvin Somers*, sen., by deed, conveyed the whole of said quarter section of land, and forty acres of the adjoining quarter, in fee, to the appellants, *Isaac* and *Jonathan Somers*, his sons by a former marriage. The consideration expressed in the deed is $6000, but the evidence shows that the consideration actually paid was $2500, which, by the direction of *Golvin Somers*, was paid to his other children, to whom *Isaac* and *Jonathan* executed their notes. *Elizabeth*, the wife, did not join in this deed.

*Golvin Somers*, sen., died in 1858, and his wife *Elizabeth* died some time afterward, without issue.

The plaintiffs, who are the brothers and sisters, and heirs at law, of *Elizabeth Somers*, claim by descent from her, the interest in the quarter section of land conveyed to her by her father, *Silas Pumphrey*, and bring this suit to recover the same, and to set aside, as void, the deed of *Golvin* and *Elizabeth* to *Stineman*, the deed of *Stineman* to *Golvin Somers*, and the deed of the latter to *Isaac* and *Jonathan Somers*, so far as it conveys the interest formerly held by said *Elizabeth* in the quarter section of land conveyed to her and her sister *Jane* by their father.

The reasons alleged in the complaint for setting aside said deeds are :

1. That the said *Elizabeth*, at the time she executed the deed to *Stineman*, was of unsound mind, and, therefore, incapable of making the same.

2. That the deed to *Stineman* was procured from said *Elizabeth* by the fraud, covin and deceit of said *Golvin* and *Stineman*, in falsely representing to her that, unless she executed it, the land would be taken to pay the debts of said *Golvin;* and that the deed from *Golvin* to *Isaac* and *Jonathan Somers* was made without any valuable consideration whatever.

3. That the deed to *Stineman*, though signed and acknowledged, was never delivered to him, but that said *Golvin*, without having delivered the same, had fraudulently procured it to be recorded. It is also averred that there was no valid consideration for the said deed.

The defendants answered by general denial, and one special paragraph. The latter is not important in the examination of the questions raised on the record, and, therefore, will not be further noticed.

The suit was originally instituted in the *Fayette* Circuit Court, but, on change of venue, was transferred to the *Franklin* Circuit Court. There was a jury trial, and finding for the plaintiffs, upon which the court, over a motion

for a new trial by the defendants, rendered judgment in accordance with the prayer of the complaint.

The defendants appeal. The questions urged here, upon which a reversal of the judgment is claimed, arise upon instructions given, and instructions refused, and upon the alleged insufficiency of the evidence to sustain the finding of the jury.

We will first examine the questions as to the instructions given and refused.

The court, at the instance of the plaintiff below, instructed the jury as follows :

1. " If you believe, from the evidence, that, at the time the deed was made by *Golvin Somers* and his wife to *John Stineman*, the wife, *Elizabeth*, was a person of unsound mind, the deed is *void*, and would pass no title : the heirs of *Elizabeth* would inherit the land at her death; and, if the plaintiffs are her heirs, they would be entitled to recover in this case."

2. " If, at the time of the execution of the *Stineman* deed, the said *Elizabeth* was a person of such weak intellect that she was not capable of comprehending the effect of the transaction on her legal rights, she would be, in legal contemplation, a person of unsound mind, and the deed would be void."

These instructions are both erroneous. They both assume that if *Elizabeth* was of unsound mind at the time she executed the deed to *Stineman*, the deed was *void*, and conferred no title on *Stineman*. No inquest was ever organized under the provisions of the statute, by which *Elizabeth* was found to be a person of "unsound mind," nor had she ever, in any manner, been placed under guardianship as a person of unsound mind; and it has been held by this court that the deed of a person of unsound mind, not under guardianship, conveys a seisin, it being voidable only, and not void. *Crouse* v. *Holman*, 19 Ind. 30 ; see also the authorities there cited.

On the question of the unsoundness of mind, the

defendants below asked the court to instruct the jury as follows, viz:

10. "Mere weakness of understanding is no objection to a person disposing of his or her property. Courts and juries cannot measure the size of people's understanding and capacities, nor examine into the wisdom or prudence of persons in disposing of their estate."

11. "That if the jury, from the evidence, should even believe that *Mrs. Somers* was a woman of weak mind, that would not be sufficient to authorize them to set aside her deed."

The court refused to give these instructions as asked, but, as a substitute for No. 11, instructed the jury, "That if they, from the evidence, should even believe that *Mrs. Somers* was a woman of weak mind, it would not be sufficient to set aside her deed: provided, she had sufficient capacity to understand the nature of the contract she made." The instructions asked by the defendant, we think, were substantially correct, and applicable to the evidence in the case, and should, therefore, have been given as asked. The qualification added by the court to the eleventh was incorrect, and well calculated to confuse and mislead the jury.

A clear distinction is drawn in the law, between mere weakness of intellect and insanity, or unsoundness of mind. Mere weakness of mind is not idiocy or insanity, nor does it amount to "unsoundness of mind," within the meaning of the law. But the qualification added by the court confounds them, and destroys the distinction; besides, it was calculated to leave the impression that if the evidence showed that *Elizabeth* was a person of weak mind, it would be sufficient to avoid the deed, unless the defendant could show that, notwithstanding such weakness, she had sufficient capacity to understand the nature of the contract. This would be changing the burden of proof. See 2 Kent. Com. marg., p. 452; Chitty on Con. 130; 1 Pars. on Con. 383.

The court, at the request of the plaintiffs below, also gave the jury the following instructions:

4. "If the deed to *Stineman* was procured by fraud, it is *void*, and any misrepresentation made to her, which deceived and misled her, and induced her to execute this deed, is a fraud."

5. "Any concealment of the legal rights of said *Elizabeth*, of which she had no knowledge, was a fraud, and if the deed was thus procured it is void."

6. "If the deed to *Stineman* was void by reason of the unsoundness of mind of said *Elizabeth*, or of *fraud*, or of nondelivery, the heirs of said *Elizabeth* have a right to recover the land, no matter how many deeds have been executed since, by parties claiming under the *Stineman* deed."

These instructions were also excepted to, and the giving of them is urged as error. They are all drawn with extreme carelessness, and are very vague and indefinite, and should have been refused for that reason, if no other objection existed to them. But they do not properly express the law, and are, for that reason, erroneous.

The fourth one instructed the jury that "if the deed to *Stineman* was procured (from *Elizabeth*, was probably intended) by *fraud*, it is *void*." In such case, the deed would not be void. If fraudulent, still it conveyed a seizin, and invested *Stineman* with the title; it was, therefore, not void, but only voidable, and hence, if the defendants, *Isaac* and *Jonathan Somers*, were innocent purchasers for a valuable consideration, they were entitled to succeed upon that issue.

The only fraudulent representation charged in the complaint to have been made to induce *Elizabeth* to execute the deed, is that if she did not execute it, the land would be liable for her husband's debts; but, in this instruction, the court said to the jury, that "any misrepresentations made to her, which deceived and misled her, and induced her to execute the deed, is a fraud," and that if the deed was procured by fraud, "it is void." The instruction is very

much broader than the issue, and should not have been given.

The fifth instruction is clearly inapplicable to the issue, and the evidence in the case, and was, therefore, liable to confuse and mislead the jury; besides, it does not express the law, and hence the court erred in giving it.

The sixth instruction, among other things, lays down the proposition, that if the deed to *Stineman* was procured from *Elizabeth* by *fraud*, her heirs have a right to recover the land, no matter how many deeds have been executed since, by parties claiming under the *Stineman* deed. This is clearly not the law. *Isaac* and *Jonathan Somers* claim to be purchasers from their father, *Golvin Somers*, for a valuable consideration, and without any notice of the alleged fraud; and if so, they are protected in their purchase, and will hold the land against the heirs of *Elizabeth*, notwithstanding such fraud.

At the request of the defendants, the court instructed the jury, that "if they believe, from the evidence, that the defendants bought the land of their father for a valuable consideration, and have paid the same, the plaintiffs cannot recover the lands back from them, even though the deed from the said *Elizabeth* to *Stineman* was obtained by the fraud of their father, unless they were parties to it, or knew of it at the time of their purchase."

This instruction seems to contain a correct exposition of the law arising upon the assumed state of facts, but it is in direct conflict with so much of the foregoing sixth instruction, asked by the plaintiffs, and given by the court, as relates to the same subject. The two charges are inconsistent with each other, and cannot be reconciled. Neither of them was drawn by the court, and their inconsistency was, doubtless, overlooked; still they were both given to the jury as the law, and, being inconsistent with each other, must have left the jury in doubt and uncertainty which to believe. It was error to place the jury in such a condition.

The defendants asked the court to instruct the jury:

2. "That if the defendants held the land in controversy by deed from *Golvin Somers*, and paid him a valuable consideration for it, not knowing, at the time of their purchase, that the said *Elizabeth Somers* was of unsound mind at the time she executed the deed to *Stineman*, or that the same had been obtained by fraud, the plaintiffs cannot recover."

We have already shown, that if the defendants, *Isaac* and *Jonathan Somers*, were innocent purchasers, in good faith, for a valuable consideration, their title would not be affected by the fraud of *Golvin Somers*, or *Stineman*, in procuring *Elizabeth* to execute the deed to the latter. But this instruction goes further, and assumes that the same rule would apply if *Elizabeth* was of unsound mind at the time she executed the deed. The authorities are not uniform as to the effect, in various cases, that may be given to the contracts of persons who are of unsound mind at the time of making them. The general rule, however, applicable to contracts of the character of that under discussion here, seems to be settled, that such contracts may be avoided, either by the persons themselves, or their legal representatives. See Chitty on Cont. 5 Am. from 3 Lond. ed., pp. 135 to 139; 1 Pars. on Cont., ch. xx, p. 383. But if reason be again restored, the contract, made when the person was of unsound mind, may be affirmed. *Crouse* v. *Holman*, 19 Ind. 30.

The contract of a *non compos mentis* differs materially from one procured by fraud from a person of sound mind. In the latter case, the contract is made by one of sufficient capacity, and competent to make it, and his mind has consented to it, but that consent has been induced by the fraud of the other contracting party; but, if the person is *non compos mentis*, there is a want of capacity to contract; he does not, in a legal sense, consent, because there is a want of that mental capacity essential to a legal consent. In this respect, the case seems to be

analogous to the contract of an infant, in whom there is, also, a want of capacity to contract, and it has been held that a deed made by an infant might be avoided by his heirs, though the estate had passed into the hands of a *bona fide* purchaser, for a valuable consideration. *Doe ex dem. Moore et ux.* v. *Abernathy*, 7 Blackf. 442.

We think the instruction was correctly refused.

The court was also asked, by the defendants, to give to the jury the following instruction:

8. "That if *Somers* and wife and *Stineman* met together, and *Somers* and wife made, signed and acknowledged th·· deed in controversy, on one evening, leaving the deed in the room where it was signed and acknowledged, and where *Somers* and his wife resided, *Stineman* residing in a part of the same house, and if *Stineman* and his wife went back into the same room next morning, and made, signed and acknowledged the deed back to *Somers*, and left both deeds with *Somers*, who, afterward, got them recorded, that this was a good and valid delivery of both deeds."

The court refused to give the instruction as asked, but gave it with a qualification, by omitting the words at the close, "that this was a good and valid delivery of both deeds," and adding, instead thereof, these words : "*That this was evidence tending to show a delivery of the deed in controversy.*" There is no controversy in the case as to the delivery of the deed from *Stineman* and wife to *Golvin Somers*.

Ordinarily, the question as to the delivery of a deed is one of fact, to be determined by the jury. But it may arise in a form to present only a question of law for the determination of the court, or it may present a mixed question of law and fact, in which the jury determines the facts, and the court the law arising upon the facts as proved.

The law does not prescribe any particular form of words, or actions, as necessary to consummate a delivery. Any thing done by the grantor, from which it is apparent that a

delivery is thereby intended, either by words or acts, or by both combined, is sufficient.

In *Dearmond* v. *Dearmond*, 10 Ind. 194, it is said that, "The question, what constitutes the delivery of a deed, has been much discussed. It is much a question for the jury in each particular case. A deed may be delivered by words without actions, and by actions without words. 7 Petersdorff 660. It may be delivered without being actually handed over. Chit. Con. 3. If once delivered, its retention by the grantor does not divest the title of the grantee. *Connelly* v. *Doe*, 8 Blackf. 320.

"To constitute a delivery, it would seem that the deed must pass under the power of the grantee, or some person for his use, with the consent of the grantor. Petersdorff *supra; Wilson* v. *Cassidy*, 2. Ind. 562."

In *McNeely et al.* v. *Rucker*, 6 Blackf. 391, in which *Rucker* and his wife conveyed real estate held by the wife, in fee simple, before her marriage, to the grandson of the husband, and the deed was sent by the husband, in the presence of the wife, to be recorded, it was held, that the deed having been signed, sealed and acknowledged by the husband and wife in due form, and sent by the former, in the presence of the latter, to the recorder's office to be recorded, it was legally delivered.

And so in *Mallett et ux.* v. *Page et al.*, 8 Ind. 364, it is said: "It seems clear that the mortgage was delivered. It was left for record at the proper office, and that is *prima facie* a delivery. No particular form is necessary to perfect a delivery of a deed. A deed may be delivered by any acts or words evincing the intention of the grantor to deliver it. Thus, in *Folly* v. *Vantuyl*, 4 Halst. 153, *Folly* made a bond to his daughter, and holding it up to her, said: "*Mary*, this is your bond, what shall I do with it?" adding, "I will take care of it for you;" he then endorsed it, "*Mary's* bond," and put it away in his trunk. This was held to be a good delivery.

A reference to the evidence will show the relevancy of the instruction to the facts in the case.

Three witnesses, *Stineman* and his wife, and *Golvin Somers*, jr., testified in reference to the execution of the two deeds. *Stineman* testifies that he was working for *Golvin Somers*, sen., and lived in the kitchen of *Somers'* house, on the land in controversy; *Somers* and his wife living in the adjoining room of the same house; that some time prior to the day on which the deed in controversy was made, *Somers* told him that he (*Somers*) wished to deed his land to him (*Stineman*), but did not give any reason for it; that, on the evening when the deed was executed, *Somers* invited him and his wife into the room where *Somers* lived; that they went in, and found *Somers* and his wife, and *Esq. Bonham*, in the room; that *Bonham* wrote the deed, and took the acknowledgment, and laid the deed, after it was signed and acknowledged, on a stand; that he saw the deed open on the stand, and saw the writing in it, and in some way learned what it was, but that *Somers* did not tell him why he had invited him into the room; that to the best of his recollection, he did not have the deed in his hand; he did not read it, nor did any person read it to him; that *Somers* did not deliver it to him, nor offer to do so; that before he left the room, *Bonham* folded the deed up, and laid it down again on the stand, and, he thinks, it was still there when he left the room. That early the next morning, *Somers* again invited him and his wife into the same room, and told him that he wanted him and his wife to deed the land back again to him (*Somers*); that when they went into the room that morning, the same persons being present as on the evening previous, *Bonham* wrote the deed to *Somers*, and they (*Stineman* and his wife) signed it and acknowledged it; the first deed, he thinks, was still on the stand the next morning, and he left them both there, and gave no direction of any kind in reference to them.

*Mrs. Stineman* corroborates, substantially, the testimony of her husband, except that she says, that after she and

her husband went into *Somers'* room, in the evening, and before the first deed was signed, *Somers* said: "I am going to deed the land to you," speaking to her and her husband.

*Golvin Somers,* jr., was examined for the defendants, and testified that he was present at the execution of both the deeds; that in the evening, when *Bonham* was about to take the acknowledgment of the deed to *Stineman,* he read it aloud in the presence of all the parties; and that after it was signed and acknowledged, *Bonham* offered the deed to *Stineman,* who took it out of *Bonham's* hands, stood a moment, and said he reckoned he might as well leave the deed with *Somers,* that he had no convenient place of taking care of it, and thinks he threw it down on a stand. He further testified that *Elizabeth Somers* wrote her own name to the deed; that *Stineman* and wife, the next morning, executed a deed conveying the same land back to *Golvin Somers,* sen.

It will be observed that *Golvin Somers,* jr., testifies to an actual delivery of the deed to *Stineman,* but his statement, in that respect, is contradicted by *Stineman* and his wife. The instruction, however, asked by the defendants, is founded upon the evidence of *Stineman* and his wife alone, leaving out of view the evidence of *Golvin Somers,* jr.

Any presumption of an intention to deliver the deed by *Somers* and his wife, to be drawn from the facts and circumstances occurring at the time, and connected with the signing and acknowledgment of the deeds, and of their final possession by *Somers,* was a question of fact for the jury, and, however strongly they may have tended to show a delivery of the deed to *Stineman,* it was, nevertheless, the province of the jury to determine the fact. But an additional fact is assumed in the hypothetical instruction asked, and is clearly shown by the evidence, that must not be overlooked in determining the correctness of the action of the court in refusing to give the instruction as prayed. We refer to the fact that, soon after the execution of the deeds,

*Golvin Somers* took, or sent, them to the recorder's office, and procured them to be recorded. An actual delivery of the deed by *Golvin Somers* to *Stineman*, in the absence of fraud, would be deemed a delivery also by the wife. And according to the authorities, *supra*, the leaving of the deed at the recorder's office by *Golvin Somers*, one of the grantors, to be recorded, is, at least, a *prima facie* delivery to *Stineman*, such act being regarded by the law as an unconditional delivery to a third person, for the use of the grantee. *Tompkins, &c.,* v. *Wheeler et al.,* 16 Peters 106.

We think the instruction, as asked, was substantially correct, and should have been given.

There are other facts and circumstances, presented by the evidence in the case, not referred to in the hypothesis upon which the instruction is based, which, we think, have an important bearing on the question. It is clearly shown that the object of *Somers* and his wife, in executing the deed to *Stineman*, was that he should convey the land to *Golvin Somers*, the husband. The latter had paid the $600, the consideration money, to *Silas Pumphrey*, and for that reason, *Mrs. Somers* desired that he should have the land. The title was in her, and she could not convey it directly to her husband. It was, therefore, conveyed to *Stineman*, that he might convey to *Somers*. *Stineman* was but a naked trustee, to receive the title for, and transmit it to, *Somers;* a mere conduit, through whom the title to the land was conveyed from *Mrs. Somers* to her husband. The delivery of the deed to *Stineman* was necessary to accomplish that object, and it seems clear that when it was signed and acknowledged by the grantors, it was so placed at the disposal, or under the power, of *Stineman*, as in the intention of *Somers* and his wife, to constitute a delivery. *Stineman*, too, must have so regarded it, for, acting upon the assumption of its delivery, by which the title became vested in him, he conveyed the land, the next morning, to *Somers*. There is also evidence, which is uncontradicted, that *Mrs. Somers* declared her desire and intention to have

the land conveyed to her husband, and, after the convey-
ances were made, spoke of the deed as having been exe-
cuted, and of her object in executing it, and said that the
land belonged to her husband. These facts, taken in con-
nection with the fact of placing the deed upon record,
we think, should be conclusive that the deed was legally
delivered.

The evidence is all in the record, and, after a careful
examination, we find nothing in it reasonably tending to
prove that the execution of the deed by *Mrs. Somers* was
procured by fraud, as charged in the complaint.

The only remaining question to be examined is, does the
evidence sustain the finding of the jury for the plaintiffs,
on the alleged ground that *Elizabeth Somers*, at the time of
the execution of the deed to *Stineman*, was of unsound
mind?

*Bouvier*, in his Law Dictionary, defines the words *non
compos mentis* to "signify, not of sound mind. This is a
generic term, and includes all the species of madness,
whether it arises from: 1, idiocy; 2, sickness; 3, lunacy;
or, 4, drunkenness."

To the same effect is our statute, which enacts that
" The words, 'person of unsound mind,' as used in this act,
or any other statute of this state, shall be taken to mean
any idiot, *non compos*, lunatic, monomaniac, or distracted
person."

The evidence in this case in no wise tends to prove that
*Elizabeth Somers* was either a lunatic, monomaniac, or
distracted person. But if any defect of mental capacity
existed, it was organic, and existed from her nativity. If
she was of unsound mind, within the meaning of the
statute, she was an idiot.

Before looking to the evidence, it is proper that we first
ascertain the legal meaning of the word idiot, in its appli-
cation to the alleged unsoundness of mind of *Mrs. Somers*,
at the time she executed the deed.

*Bouvier* says that *idiocy* is "that condition of mind in

which the reflective, or all, or a part, of the affective powers, are either entirely wanting, or are manifested to the least possible extent. Idiocy generally depends upon organic defects." And that an *idiot* "is a person who has been without understanding from his nativity, and whom the law, therefore, presumes never likely to attain any. It is an imbecility, or sterility, of mind, and not a perversion of the understanding. When a man cannot count or number twenty, nor tell his father's or mother's name, nor how old he is, having been frequently told of it, it is a fair presumption that he is devoid of understanding."

This rule would seem to be a sufficient test of the want of understanding, where the power to the extent indicated does not exist; but to hold that a person should be deemed of sound mind, and responsible for his acts in every case, where he possesses sufficient mental capacity to count twenty, and tell his father's and mother's names, or his own age, would seem to fix a rather low and uncertain standard of a sound mind.

*Mr. Chitty*, in his work on Contracts, p. 130, says: "An idiot, or natural fool, is one that hath had no understanding from his nativity; and who is, therefore, by law, presumed not to be likely to attain to any. A person is not an idiot if he hath any glimmering of reason, so that he can tell his parents, his age, or the like common matters."

The same definition, substantially, is given by *Petersdorff*, vol. 12, p. 390.

The law does not assume to measure the different degrees of power of the human intellect, or to distinguish between them, where the power of thought and reason exists. It would be impossible to do so. But it attempts to draw a line between sanity and insanity, or, in other words, between the presence and absence of reason, thought and comprehension. It cannot go further.

It is said by *Mr. Parsons*, in his able work on Contracts, vol. 1, p. 134, that, "Courts of law, as well as equity, afford protection to those who are of unsound mind. They

endeavor to draw a line between sanity and insanity, but cannot so well distinguish between degrees of intelligence. Against the consequences of mere imprudence, folly, or that deficiency of intellect which makes mistake easy, but does not amount to unsound or disordered intellect, even equity gives no relief, unless the other party has made use of his want of intelligence to do a certainly wrongful act."

Chancellor KENT lays down the rule thus: "Imbecility of mind is not sufficient to set aside a contract, when there is not an essential privation of the reasoning faculties, or an *incapacity of understanding and acting with discretion in the ordinary affairs of life.* This incapacity is now the test of that unsoundness of mind which will avoid a deed at law. The law cannot undertake to measure the validity of contracts by the greater or less strength of the understanding; and, if the party be *compos mentis,* the mere weakness of his mental powers does not incapacitate him." 2 Kent Com. 573. This, it seems to us, is the correct rule.

Tested by this rule, how stands the case upon the evidence? The evidence on the point is quite voluminous, and we do not propose to give a detailed abstract of it in this opinion. But we have examined it with much care, and find that the following material facts are established by it beyond controversy, viz:

That *Elizabeth* had learned to read and write, and signed her own name to the deed to *Stineman.* She was a member of a reputable church, and in good standing. Her mother died many years before her marriage to *Somers,* and, being the eldest of three sisters, she took charge of her father's household affairs, and conducted them prudently, and with, at least, ordinary skill, and continued to do so until her marriage; that upon her marriage with *Somers,* she took charge of his house, having exclusive control of his household, and discharged the various duties with ordinary skill and judgment. She did most of her own sewing, and taught and instructed the infant daughters of *Somers* in all the ordinary domestic duties, including cooking, knitting

and sewing, and is said to have been a good cook. In a word, she discharged with fidelity her duties as a member of the church, as a dutiful daughter, and as a faithful wife and step-mother.

Her father recognized her to be of sound mind, by trading with her, executing to her a deed for the land in controversy, and taking from her a note for the purchase money, and by permitting her to contract marriage without opposition.

Thirteen witnesses were examined on the part of the plaintiffs, in reference to the mental capacity of *Mrs. Somers.* Three of the number were medical men, the others not claiming to be experts; most of whom seem to have been allowed to express their opinions of her capacity in their own way, without first stating facts within their knowledge, on which to base an opinion.

Their whole evidence, however, falls far short of establishing the fact that she was an idiot, or of unsound mind. It does not fairly tend to prove more than that she was a person of weak mind.

We select the evidence of *Dr. Silvey,* as a fair version of that of all those who testify most strongly against the defendants. He says he regarded *Elizabeth* as a woman of weak mind; she might have made a housekeeper, but he thinks an inferior one. He thinks, without instruction, she would not comprehend the effects in future, on her legal rights, of any transaction. She was not an *idiot,* nor of strong mind, but below a medium. He thinks ten per cent. of women as weak as she was.

On the other hand, seven witnesses, including one physician, examined on the part of the defendants, testified that *Elizabeth* was a woman of medium mind and understanding. We do not, however, claim to weigh the evidence, and determine its preponderance; that was the province of the jury. But excluding entirely the evidence given for the defendants, and looking alone to that of the plaintiffs, it seems to us clear that it does not, fairly considered, even

reasonably tend to establish the fact that *Elizabeth Somers* was of unsound mind at the time of executing the deed to *Stineman*.   It does not prove that there was an "essential privation of the reasoning faculties, or an incapacity of understanding and acting with discretion in the ordinary affairs of life."   For the various reasons given in this opinion, the judgment is reversed, with costs, and a new trial awarded, and the cause remanded to the court below for further proceedings, not inconsistent with this opinion.

*N. Trusler, J. S. Reid, G. Holland* and *C. C. Binkley,* for appellants.

*J. C. McIntosh, B. F. Claypool* and *J. M. Wilson,* for appellees.