## Bank *v.* Sneed.

### (*Jackson.* June 29, 1896.)

1. BILLS AND NOTES. *Renewal by non compos accommodation indorser.*

    The mental incompetency of an accommodation indorser at the time of signing a note in renewal of one which he indorsed when fully competent to do so, does not prevent his estate from being liable on the renewal note, when the holder took it in good faith and thereupon extinguished and surrendered the old note, so that he cannot be restored to his original position. (*Post, pp. 121–131.*)

    Cases cited and approved: 32 Vt., 652; 38 N. J. L., 536; 2 Exchq. R., 489; 38 Ind., 181; 10 Pa. St., 56 (S. C., 49 Am. Dec., 573); 78 Pa. St., 407 (S. C., 21 Am. R., 24); 97 Pa. St., 543.

    Cited and distinguished: 46 Iowa, 62.

2. CORPORATIONS. *Notice to.*

    The knowledge of one member of the discount committee of a bank, being also president of the bank, who was not present when the renewal of a note was taken, and had no part in the transaction, is not enough to charge the bank with notice of the fact, known to him, that the indorser of the note had become incompetent to do business. (*Post, pp. 131, 132.*)

    Cases cited and approved: Bank *v.* Campbell, 4 Hum., 395.

FROM SHELBY.

Appeal from Chancery Court of Shelby County. STERLING PIERSON, Ch.

Bank v. Sneed.

WILLIAM M. RANDOLPH & SONS for Bank.

MYERS & BANKS for Sneed.

BEARD, J. The complainant in this cause, by its bill, sought to recover on two promissory notes, one for $7,500, dated October 3, 1892, and due at ninety days, and the other for $3,000, dated October 22, 1892, and due at four months, made by W. A. Sneed, to the order of, and indorsed by, W. M. Sneed. At maturity these notes were presented for payment to the maker, and this being refused, they were protested, of all which the indorser had due and legal notice. No defense was made by the maker of this paper, but Mrs. Neely, the executrix of W. M. Sneed, resisted recovery upon the ground that her testator was *non compos mentis* at the time he indorsed the same. Upon the trial, the Chancellor pronounced a decree, not only against the maker, but also against the estate of the indorser. From this decree, the executrix alone prosecutes an appeal to this Court.

The notes sued on were renewal notes, the last of two series made and indorsed by the same parties, the originals of which were discounted for the maker by the complainant bank in 1890. On all these notes W. M. Sneed was an indorser for the accommodation of W. A. Sneed, without any interest whatever in the proceeds of the discount.

So far as the facts are concerned, on which rests the contention of the executrix that her testator

was of unsound mind when he entered into these two contracts of indorsement, it is sufficient to say that he had been, for more than twenty years, an active and prosperous member of the Memphis bar, and at the same time was interested in, and for a considerable period controlled, large enterprises outside of his profession. He was a man of energy, integrity, and sound business judgment, as the result of which he succeeded in acquiring a high reputation in the commercial community and in accumulating a large fortune. Unremitting attention to his various duties, according to the testimony of experts, finally brought on an attack of paresis—a disease which is described as attacking the organic brain structure —which, though slow in its progress, culminated, on or about October 15, 1892, in serious mental disturbance. Up to that time, we think it is clear from the record, whatever may have been the course of the disease, that he was in possession of his mental faculties, and fully able to bind himself by contract at the time he indorsed the $7,500 note, of date the third of October. After the fifteenth, and up to and including the twenty-second of that month, his mind was the subject of delusions, and, while he continued his daily visits to his office and his attention to his numerous business interests, yet we think the testimony in the case shows that, on October 22, 1892, when he indorsed the $3,000 note, he was, to a considerable degree, *non compos mentis.* Of this fact, however, the bank had no

notice, when it canceled and delivered the old note, maturing that day, to the maker, and took from him this new note in its room and stead.

Upon this finding of the facts, the only question left for determination is, can the estate of W. M. Sneed escape liability on this indorsement, on the ground that he was insane at the time of making it? It is conceded that, as a general rule, the contract of a lunatic may be avoided. To this, however, there is this well-recognized exception, that where a contract has been entered into in good faith, without fraud or imposition, for a fair consideration, without notice of the infirmity, and has been so far executed that the parties cannot be restored to their original positions, it will not be set aside by the Courts. 5 Lawson's Rights & Rem., Sec. 2389; 2 Pom. Eq. Juris., Sec. 946.

It is said that such a contract is enforced against the party *non compos mentis,* not so much upon the idea that it possesses the legal essential of consent, but rather because, by means of an apparent contract, he has secured an advantage or benefit which cannot be restored to the other party, and therefore it would be inequitable to permit him, or those in privity with him, to repudiate it. *Lincoln* v. *Buckmaster,* 32 Vt., 652; *Mathewson* v. *McMahon,* 38 N. J. L., 536.

The reports are full of cases which serve to illustrate this exception to the general rule. A few only will be referred to. In England, *Moulton* v.

*Camroux*, 2 Exchq. R., 489 (affirmed in 4 Exchq. R., 489), is a leading case on this subject. In the opinion of the Court, reported in 2 Exchq. R., 489, it is said: "We are not disposed to lay down so general a proposition as that all executed contracts, *bona fide*, must be taken as valid, though one of the parties be of unsound mind. We think, however, that when a person comparatively of sound mind, and not known to be otherwise, enters into a contract for the purchase of property, which is fair and *bona fide*, and which is executed and completed, and the property, the subject-matter of the contract, has been paid for and fully enjoyed, and cannot be restored so as to put the parties in *statu quo*, such contract cannot be afterwards set aside, either by the alleged lunatic or those who represent him." This rule, or rather this exception to the general rule, has been recognized and applied by American Courts in a great variety of cases. In *Wilder* v. *Weakley*, 34 Ind., 181, an action was maintained against the estate of a lunatic, on an account for whisky, etc., sold to him in good faith and without knowledge of his lunacy. The Court there said: "It is laid down by an elementary writer that if a party to a contract was, at the time he entered into the engagement, a lunatic or of unsound mind, and any imposition appears to have been practiced upon him, or any advantage taken of his infirmity by the other contracting parties, the contract will be void, as having been procured by fraud. But if the contract is a fair

and honest contract, and bears no symptoms of the infirmity of the mind of the party sought to be charged thereon, the Courts will enforce it like any other contract. An action for the price of goods sold and delivered, or of work done, or for the hire of horses, carriages, and servants, cannot be defeated by showing that the defendant had been found by inquisition to be a lunatic at the time he received the goods, or had the benefit of the work, or the use of the horses, carriages, and servants."

In *Beals* v. *Gee*, 10 Pa. St., 56 (S. C., 49 Am. Dec., 573), the plaintiff, as administrator of one Dorr, sought to recover the value of certain goods purchased by Dorr from the defendant, upon the ground that his intestate was insane at the time of the purchase. The testimony showed that the goods were unsuited to the object for which they were bought, that the price agreed upon exceeded their market value, and that plaintiff had tendered them back to the defendants. On these facts the Court found for the defendants, and, in its opinion, distinctly rested its conclusions upon this exception to the general rule. *Lancaster Bank* v. *Moore*, 78 Pa. St., 407 (S. C., 21 A. R., 24), was a case where a bank, in good faith and without any knowledge of his infirmity, discounted a note for a lunatic, and paid him over the proceeds, and in it the same principle was applied.

While conceding that these cases were properly decided, and that the doctrine announced by them is

sound, within proper limitations, it is insisted by appellant that, as all of them involve the purchase of property by or the loan of money to the lunatic, transactions by which something was added to his estate, they afford no authority for the contention of complainant in this case. As we understand these cases, their underlying principle is this: A lunatic or his privies will not be permitted to repudiate a contract from which he has received a clear benefit, where the other contracting party acted in good faith, without notice of the infirmity, and where, upon repudiation, the *status quo* of the parties cannot be restored. That this is a sound distinction we entertain no doubt. The question, then, is, did Mr. Sneed, the insane accommodation indorser of this note, receive any benefit from this transaction, and, if so, in the event it is set aside, can the parties be placed back in their original positions?

In reply to the first part of this question, we say that it is apparent to us that he did receive a benefit, which was a consideration to him for his indorsement. He was of sound mind when he put his name on the back of the original note and of all the intervening renewal notes, including that which matured on the twenty-second of October. By his indorsement, he undertook that the paper would be honored by the maker when it fell due, and that, if dishonored, then, upon due presentment, nonpayment, and notice, the holder might proceed at once against him (the indorser). Tiedeman on Com. Pap.,

Sec. 259; 2 Rand. on Notes and Bills, Sec. 742.    This promise or undertaking, while conditional, was none the less a binding legal obligation, maturing on the same day as did the positive obligation of the maker. Now, when the bank surrendered the note which fell due on the twenty-second, and took in its stead the one in controversy, the effect of which was to give a further indulgence of four months, it conferred a valuable benefit upon both maker and indorser, and, in so far as this record discloses, the benefit or advantage which accrued to the indorser was quite as great as that to the maker—because there is no suggestion here that the latter was either ready or able to meet the note that fell due that day.    If he did not, then, upon proper steps being taken, it would have been the duty of the indorser at once to have discharged it.

We think there can be no doubt, in the light of the authorities, if the indorser had gone to the bank on the twenty-second, and by his solicitation had obtained a renewal of this paper, in order that he might be · saved from making good his obligation which was likely to mature that day, and it had been granted, without notice of his infirmity, that neither he, nor his executrix, would be heard to say that as he was insane that day, and received no benefit in the way of goods purchased, or money borrowed, from the bank, there should be no recovery on his indorsement.    And we can see no difference, as a matter of principle, between that case

and the one presented at the bar, where the same result is accomplished for him by the maker, who has been placed in possession of the indorsed paper, in order that it might be used to that end. Not only was there a benefit conferred upon the indorser in this matter, but it is evident that it is impossible for the original positions of the parties to be restored. The old note has been extinguished and surrendered. It cannot be revived, and, if it could be, the day for payment and protest is long since past. The result is, that, unless the bank can hold his estate upon this renewal paper, which he contributed to induce the bank to take by indorsing it and intrusting it to the maker, and from which he derived the benefit already mentioned, then the bank must lose its claim against his estate, although it acted in good faith and in accord with sound business principles.

The diligence of counsel, supplemented by a careful search by this Court, has been able to discover but one case that furnishes any analogy to the one at bar. That is the case of *Snyder* v. *Laubock*, tried in a Common Pleas Court of Pennsylvania, and reported in a law periodical published in Philadelphia. 7 Weekly Notes of Cases, 464.

As that publication is not generally accessible to the profession, it is thought proper to state the facts of the case and the conclusions of the Court with some fullness:

"On June 9, 1873, J. H. Lilly borrowed from

the Dime Savings Institution of Bethlehem, the sum of $1,500 upon his promissory note to the order of Robert Yost, which was indorsed by Yost as an accommodation indorser. To secure Yost against his indorsement, Lilly, upon the same day, confessed judgment to Yost for the amount of the note, which was entered up on the next day. The note was renewed every three months until some time in February, 1875, when Lilly sold the store and lot of ground upon which the judgment was a lien to William H. Buss, who, assuming Lilly's indebtedness, took up the old note and gave the bank, in its place, his own note for $1,500 to Yost's order, and with Yost's indorsement, the latter consenting to indorse for him. At the same time there was a written agreement between Lilly and Buss that the judgment given to secure the old note should remain a lien on the above real estate as collateral security for the future indorsement of the note, it being the same debt. Lilly, on his part, agreed to indemnify Yost against his indorsements for the note. Yost continued to indorse for Buss up to February 16, 1876, the date of the last renewal. Upon that day, when Buss took the note to Yost for his indorsement, although he noticed that there was something wrong with Yost, he did not, from his conversation, think him crazy. Buss took the note to the bank, which accepted it and returned the old note canceled."

The note was protested by the bank for non-payment and suit afterwards brought thereon against

13 p—9

the administrator of Yost. The administrator refused payment on the ground that his testator was insane at the time of the indorsement. The Court found as a fact that "there was no evidence to charge the bank with notice of his lunacy." The opinion of the Court is very brief, and is as follows:

"However it might have been had the note in suit been an original note, indorsed by the alleged lunatic for the accommodation of Buss, yet the case was different when it appeared that it was a renewal of a note for a similar amount, upon which he was also an accommodation indorser. There had been several renewals, at each of which, as well as the execution of the first note, Yost was unquestionably of sound mind. He had taken and held a judgment against the original maker as collateral security for the note. Yost was clearly liable on the note of. which the note in suit was a renewal. There was full consideration therefor, and the case is directly within the decision of this Court in *Lancaster Bank* v. *Moore*, 78 Pa. St., 407," referred to *supra*.

But it is insisted that that case is not an authority in the one at bar, because the Court there rested its conclusion on the fact that the indorser, Yost, had received in the judgment lien collateral security for his indorsement. It is true the Common Pleas Court, in its opinion, did emphasize this, and did speak of it as a consideration passing to the indorser. Subsequently, however, that case was referred to, and, by clear implication, approved by

the Supreme Court, in *Wirebach* v. *First National Bank*, 97 Pa. St., 543, and that Court ignored, as a controlling element in the case, the fact that Yost had received collateral security. It said: *"Snyder* v. *Lanbach*, 7 W. N. C., 464, is where Yost's indorsement of the note was merely a renewal of an indorsement made when he was unquestionably of sound mind, and it was held that he was clearly liable on the note of which the note in suit was a renewal. There was full consideration, and the case was within the · decision of *Lancaster County Bank* v. *Moore*, *supra*. The consideration was a debt for the amount of the renewal note."

The case of *Van Patten* v. *Beals*, 46 Iowa, 62, relied upon by the testatrix, is altogether different from the present case, in that it was held that a lunatic signing a note as surety for an antecedent debt was not bound thereby, although the other contracting party was ignorant of his infirmity. This was evidently a case where a lunatic undertook to bind himself for a debt on which he was not antecedently bound, and the Court there properly declined to hold him.

Upon a careful consideration of the case at bar, we are satisfied that it falls under the exception to the general rule which has been heretofore stated, and that the Chancellor properly held the estate of the indorser upon the note in question, unless it be true, as urged by the testatrix, that the bank had constructive knowledge of Mr. Sneed's condition when

it accepted this renewal note.    This contention rests on the fact that Mr. Neely was president of the bank, and a member of the discount committee which passed on this note, and that, at that time, he was advised of Sneed's insanity.    That Mr. Neely did sustain these official relations to the bank, and was informed of the fact in question when this new note was taken, is clear, but it is equally clear that he was not present with the committee when it was received and the old note extinguished, and had no agency whatever in the transaction, and, in fact, only obtained knowledge of it the day after it was consummated.    Under such conditions his knowledge could not affect the bank.    Morawetz on Pri. Cor., Vol. I., p. 540*c; Union Bank* v. *Campbell*, 4 Hum., 393.    It follows that the decree of the Chancellor is in all things affirmed.