WELLS ET AL. *v.* WELLS ET AL.

[No. 25,112.    Filed January 29, 1926.]

1. DEEDS.—*Evidence held to show presumptive fraud of son in obtaining, deeds from father.*—Evidence *held* to show presumptive fraud of son in obtaining deeds from father, who was old, feeble and illiterate.    p. 242.

2. FRAUD.—*Burden of proof is on party seeking to sustain transaction presumptively fraudulent because of situation of parties and nature of transaction.*—In an action to set aside deeds which were presumptively fraudulent because of the situation of the parties and the nature of the transaction, the burden is on the party seeking to sustain them to show by clear and unequivocal proof that he took no advantage of the adverse party and that the arrangement is fair and conscionable. p. 242.

3. CONTRACTS.—*Where one of the parties to a contract is insane, there can be no mutual assent thereto and therefore no contract.*—Where one of the parties to a contract is insane, there can be no mutual assent thereto and therefore no contract. p. 243.

4. INSANE PERSONS.—*Person who deals fairly with insane person, without knowledge of his insanity, is entitled to protection and should not be made to suffer financial loss thereby.*—An innocent person who deals fairly with an insane person is entitled to protection and should not be made to suffer financial loss merely because the one with whom he dealt was insane. p. 243.

5. INSANE PERSONS.—*Rule as to enforcement of executory contracts of insane persons who have not been so adjudged stated.*—Where one of the parties to a contract was insane, but had not been so adjudged at the time of making it, the contract will not be enforced so long as it remains purely executory, even though the sane party entered into it in good faith without knowledge of the insanity of the other.    p. 244.

6. INSANE PERSONS.—*Rule as to setting, aside executed contracts with insane persons who have not been adjudged insane stated.*—Where a contract has been entered into with an insane person in good faith, without fraud or imposition, for a fair consideration, without notice of the insanity, and before an adjudication of insanity, and has been executed, in whole or in part, the contract will not be set aside unless the parties can be restored to their original positions.    p. 244.

7. INSANE PERSONS.—*Disaffirmance of deed of insane person not necessary when grantee knew of infirmity.*—Disaffirmance is

not necessary where a deed has been procured from an insane person by one who knew of the grantor's mental infirmity. p. 245.

8. INSANE PERSONS.—*When deed procured from insane person by fraud, relief will not be denied because of failure to demand restoration when such demand would have been fruitless.* —Where a deed has been procured from an insane person by what amounted to constructive fraud, relief will not be denied merely because the idle ceremony of making a demand for restoration has not been performed, when such demand would have been fruitless. p. 245.

9. CANCELLATION OF INSTRUMENTS.—*Offer in complaint to place grantee in statu quo is sufficient in suit to cancel deeds procured by presumptive fraud.*—In a suit to set aside deeds of an insane person which had been procured by presumptive fraud, the grantee knowing of the grantor's infirmity, it is sufficient to offer in the complaint to place the grantee *in statu quo.* p. 248.

10. DEEDS.—*Mortgage placed on land without knowledge of deed conveying same to grantee not ratification of such deed.*— Where a son induced his aged, feeble and illiterate father to make deeds to his children, giving him relatively a much larger share than the others, a mortgage placed by one of the latter on his share of his father's land without knowledge of the deeds would not amount to a ratification, and could be adjusted in the final decree canceling the deeds. p. 248.

From Hancock Circuit Court; *Jonas P. Walker,* Judge.

Suit by Henry Wells and another against Nelson Wells and others. From a judgment for the defendants, the plaintiffs appeal. [Transferred to the Supreme Court under §1357 Burns 1926, §1394 Burns 1914.] *Reversed.*

*Samuel J. Offutt, Emsley W. Johnson* and *Joseph W. Hutchinson,* for appellants.

*Holmes & McCallister,* for appellees.

PER CURIAM.—This action was instituted by Henry Wells and Laura Myers against Nelson Wells and others to cancel certain deeds. So much of the complaint as is necessary to an understanding of the con-

troversy is substantially as follows: "That Anderson Wells died testate on July 14, 1914, and left surviving his children viz.: Nelson Wells, Henry Wells, and Laura Myers, being his only living children; that in October, 1909, he executed a will which has been duly probated, and the executor nominated in the will is now in charge of the estate; that at the time of making this will and continuously thereafter until his death, he was the owner of a tract of real estate in Marion county, Indiana, and by the provisions of his will he devised the real estate to his three children, giving to each a certain described part, whereby each child received an equal share thereof.

"That on July 6, 1911, Nelson Wells fraudulently induced his father, Anderson Wells, to make three deeds, one to each child, purporting to convey the whole of the real estate by giving to each child a particularly described part of the tract; that the deed to Nelson Wells conveyed to him four acres, the deed to Laura Myers conveyed to her two acres, and the deed to Henry Wells conveyed to him one acre; that the portion conveyed to Nelson Wells was worth $2,000, the portion conveyed to Laura Myers was worth $1,000, and the portion deeded to Henry Wells was worth $500; and that all the deeds were recorded May 18, 1912.

"That the deed to Nelson recites that the conveyance to him is made in consideration of $500; that the grantor hereby reserves the right to occupy and use said described property during his natural life; and that it is further agreed, as part consideration, that the grantee shall care for and support the grantor during his life, and upon his death shall pay all the burial expenses, and shall pay the further sum of $50 to the grantor's grandson, Franklin Wells, and shall surrender all claims he now has against the grantor.

"That the deed to Laura Myers recites that the conveyance is made in consideration of the sum of one dollar and other considerations; that the grantor reserves the right to occupy and use said property during his natural life, and as part consideration, the said Laura Myers is to assist in the care and nursing of the grantor; that the grantee shall have and hold the real estate during her life and at her death it shall go to her two children Mirtle Campbell and Mary Tolley; and that these grandchildren shall support their mother during her natural life.

"That the deed to Henry Wells recites that the conveyance is made in consideration of one dollar and other considerations; that the grantee shall assist in caring for the grantor, and shall surrender all claims he may have against the grantor.

"That while the deed to Nelson recites that it was executed in consideration of the sum of $500, in fact there was no consideration whatever for that conveyance; that the deeds to Henry and Laura were made and recorded without their knowledge or consent and that neither of them has ever ratified the conveyance nor accepted any benefits thereunder; that at the time the deeds were made, the grantor was a person of unsound mind and incapable of comprehending the nature of the transaction, and continued to be of unsound mind to the time of his death, all of which was known by the defendant Nelson Wells; that the plaintiffs have given notice of their purpose to disaffirm the deeds and have offered to do whatever may be necessary to place the defendants in *statu quo* and are now ready and willing to comply with such equitable terms as the court may find proper; and that the defendants have refused to make the necessary deeds to vest in the plaintiffs the property devised to them by their father's will.

"Wherefore, the plaintiffs pray the court to cancel the conveyances and to decree that the plaintiffs are the owners in severalty of the tracts devised to them by the will."

The defendants joined in an answer of general denial. The cause was submitted to the court, with a jury acting in an advisory capacity. The only issue submitted to the jury was embraced in the following interrogatory: "Has it been established by a fair preponderance of all the evidence in the case that Anderson Wells, at the time of the execution of the deeds in question, was a person of unsound mind?" The jury answered, "Yes." Thereupon the court took the case under advisement. Five weeks later the court made a general finding for the defendants. Thereupon the plaintiffs moved to dismiss their action, which motion was overruled. Judgment was rendered on the finding. Twenty days later the plaintiffs filed a motion to set aside the judgment in order that they might be permitted to adduce evidence to prove disaffirmance. It is averred in the motion that the deeds were "disaffirmed" before the suit was commenced; that the defendant Nelson Wells was notified of the "disaffirmance" of the deeds; that he was notified that the plaintiffs would not accept the deeds and would not be bound by them, that the deeds were not binding upon the plaintiffs or either of them, and that the plaintiffs would not be bound by the provisions in any of the three deeds; and that "by inadvertence and mistake said evidence of disaffirmance was not introduced at the trial." The motion was overruled. The plaintiffs then filed a motion for a new trial on the following grounds: (1) That the decision is not sustained by sufficient evidence; and (2) that the decision is contrary to law. That motion was overruled. The ruling on each motion is challenged by the assignment of errors.

The undisputed evidence establishes the following facts: Anderson Wells was a member of the race commonly known as the Negro race. He came to Indianapolis in the year 1867. At that time he had a wife and two sons. He had been a slave. He claimed to be over one hundred years of age. His hair was very white. At the time he executed the deeds he was in poor health and was very feeble. His health had been poor for several years. He was illiterate. In July, 1911, accompanied by his son Nelson, he went to the office of an attorney. He told the attorney that he had made a will and that he wanted to change it. On being asked where the will was, he said that he did not know; that a neighbor had taken him to a lawyer's office where the will was made; and that he did not know whether the lawyer or the neighbor had the will. The reason he gave for wanting to change his will was that Nelson had given him some money and would have to give him some more, that Henry did not pay what he agreed to pay, and that he did not want his children to have a lawsuit over his property after his death. The attorney thereupon told him that a party can file a claim against the estate and throw it into court just as easy under a will as if there was no will; that in fact wills often cause lawsuits where there would be none if there was no will; that if he cared to do so he could divide up his property now by making deeds as he saw fit; that he could reserve a life estate and put a condition in the deeds making the property liable for his support; that by doing so he would have a home to live in during his lifetime and an obligation on his children to support him; and that after his death there would be absolutely no room for any lawsuit to grow out of it, because then he would have no property when he died. About a month afterward the attorney was called by

telephone to the home of Nelson Wells.  Nelson's father was there.  The deeds were prepared and Anderson Wells signed each deed by making his mark thereon. Neither Henry nor Mrs. Myers was there.  The deeds were left at Nelson's home.  The attorney had been at Nelson's home a number of times before.  He had been Nelson's attorney for eighteen years.  The grantor lived at the home of his daughter who nursed and cared for him until his death.  A day or two after the death of his father, Henry Wells mortgaged the land described in the deed made for him by his father to secure a loan of fifty dollars; but at that time he did not know that his father had made him a deed.  Nelson was with him and helped him to make the loan.  The same lawyer who made the deeds was consulted about this loan. Henry testified that the loan was procured to help pay his father's funeral expenses and was so used.  Nelson testified that the money was used for something else. Nelson saw his father almost daily and knew his mental, physical and financial condition at the time the deeds were made.

In the motion for a new trial appellants contend that a new trial should have been granted because the trial court took an utterly erroneous view of the law applicable to the case, and that therefore the decision is contrary to law.

It should be noted that the complaint consists of but one paragraph and proceeds upon the theory that the deeds should be canceled on the ground of fraud.

The first things that attract attention are the situation of the parties and the nature of the transaction.

1, 2.
The father was old, feeble, illiterate, and a widower.  His condition was one of helplessness. He was no longer able to care for himself in the struggle of life, and was contemplating death.  The deeds are in the nature of a testamentary disposition of

his property. His son Nelson was vigorous, and evidently he was the dominant force in the transaction. He must have known all the facts concerning his father's age, his mental and physical condition. It is clear that the father reposed trust and confidence in the son, or that the son exercised a controlling influence over the father. No other explanation of their conduct is possible. The fact that the two other children were kept in ignorance of the transaction, and the further fact that the deeds to them were recorded without their knowledge, weigh heavily against Nelson. The lawyer who participated in the transaction was not employed by Anderson Wells. It is too apparent to admit of argument that if the relation of attorney and client existed between the lawyer who wrote the deeds and either party to the transaction, that relation was between the lawyer and Nelson Wells. At no time did Anderson Wells have a private consultation with the lawyer. At no time did the lawyer make an investigation of the facts for Anderson Wells. Nelson was always present and it is significant that the deeds were made at his home in the absence of his brother and sister. The evidence presents a clear case of presumptive fraud. In other words, from the situation of the parties and the nature of the transaction, fraud is presumed. Pomeroy, Equity (2d ed.) §943 *et seq.*; 12 R. C. L. 230; 26 C. J. 1061. See *Webster* v. *Adams* (1923), 79 Ind. App. 261, 137 N. E. 883. The burden therefore rested on Nelson to free himself from the presumption by clear and unequivocal proof; but that he has failed to do. 12 R. C. L. 472.

We come now to a consideration of the insanity feature and its true significance in the case. Counsel for Nelson Wells contend that even if the grantor was 3, 4. insane, the deeds are not void but only voidable; and that, to entitle the plaintiffs to have the deeds

canceled, there must have been a "disaffirmance" before the commencement of the action. It is elementary that a contract is the product of a meeting of the minds; and that mutual assent is necessary to the making of a valid contract. It follows that where one of the parties is insane there can be no mutual assent, and therefore no contract. Pomeroy, Equity (2d ed.) §946; 6 R. C. L. 586, 592, 594; 13 C. J. 237; 22 Cyc 1194 *et seq.* That is the plain and simple logic of the matter. But when we come to consider what is fairly and justly due those who have transacted business with insane persons, and the corresponding rights and remedies of the insane arising out of the same transactions, we find that the matter is not simple but complex. The presumption is that every person is sane. The line of demarkation between sanity and insanity is in many instances obscure and elusive. *Somers* v. *Pumphrey* (1865), 24 Ind. 231. It is obvious therefore that an innocent person who deals fairly with one who is insane is entitled to protection and should not be made to suffer financial loss merely because the one with whom he dealt was insane.

The rule seems to be universal that where one of the parties to a contract was insane, but had not been so adjudged, at the time of making it, the contract will not be enforced *so long as it remains purely executory,* even though the sane party entered into it in good faith, without knowledge of the insanity of the other. Also by the great weight of authority the further rule is established that where a contract has been entered into with an insane person in good faith, without fraud or imposition, for a fair consideration, without notice of the insanity, before an adjudication of insanity, and has been *executed in whole or in part* the contract will not be set aside *unless the parties can be restored to their original position. Fay* v. *Burditt*

(1881), 81 Ind. 433, 42 Am. Rep. 142; *Northwestern, etc., Ins. Co.* v. *Blankenship* (1884), 94 Ind. 535, 48 Am. Rep. 185; *Aetna Life Ins. Co.* v. *Sellers* (1900), 154 Ind. 370, 77 Am. St. 481; *Behrens* v. *McKenzie* (1867), 23 Iowa 333, 92 Am. Dec. 428; *Gribben, Gdn.,* v. *Maxwell* (1885), 34 Kans. 8, 7 Pac. 584, 55 Am. Rep. 233; *Flach* v. *Gottschalk Co.* (1898), 88 Md. 368, 41 Atl. 908, 42 L. R. A. 745, 71 Am. St. 418; *Young* v. *Stevens* (1868), 48 N. H. 133, 2 Am. Rep. 202, 97 Am. Dec. 592; *Eaton* v. *Eaton* (1874), 37 N. J. Law 108, 18 Am. Rep. 716; *Odom* v. *Riddick* (1889), 104 N. C. 515, 10 S. E. 609, 17 Am. St. 686, 7 L. R. A. 118; *Sprinkle* v. *Wellborn* (1905), 140 N. C. 163, 52 S. E. 666, 111 Am. St. 827, 3 L. R. A. (N. S.) 174; *Lockwood* v. *Mitchell* (1857), 7 Ohio St. 388, 70 Am. Dec. 78; *Wirebach* v. *First Nat. Bank* (1881), 97 Pa. St. 543, 39 Am. Rep. 821; *Sims* v. *McLure* (1855), 8 Rich. Eq. (S. C.) 286, 70 Am. Dec. 196; *Bank* v. *Sneed* (1896), 97 Tenn. 120, 36 S. W. 716, 56 Am. St. 788, 34 L. R. A. 274; *National Metal Edge Box Co.* v. *Vanderveer* (1912), 85 Vt. 488, 82 Atl. 837, 42 L. R. A. (N. S.) 343, Ann. Cas. 1914D 865; *American Trust, etc., Co.* v. *Boone* (1896), 102 Ga. 202, 29 S. E. 182, 66 Am. St. 167, 40 L. R. A. 250; *Corbit* v. *Smith* (1858), 7 Iowa 60, 71 Am. Dec. 434; *Hosler* v. *Beard* (1896), 54 Ohio St. 398, 43 N. E. 1040, 56 Am. St. 720, 35 L. R. A. 161. The foregoing rules are, of course, applicable to deeds.

Even if restoration were essential to equitable relief, the uncontroverted evidence in this record shows that the parties may be fully restored to their original situation; the jury found that the grantor was insane when he executed the deeds; and no reason appears why the trial court should not have followed the jury's finding and set aside the conveyance, unless it be the plaintiff's failure to prove a "disaffirm-

ance." Was proof of a "disaffirmance" essential to entitle the plaintiffs to the relief sought? If Anderson Wells was insane when he executed the deeds, he so remained until his death. Consequently, of his own volition, he could have done nothing to extricate himself. *Nichol* v. *Thomas* (1876), 53 Ind. 42; *Downham* v. *Holloway* (1902), 158 Ind. 626, 92 Am. St. 330. Had he been restored to sanity, what could he then have done? In that event, being fully apprised of his situation and fully comprehending the effect of the transaction, he might have been entirely satisfied; and, if so, he could have adopted the transaction and made it his own. This he could have done by mere acquiescence; or by accepting the consideration or benefits, if any. *Hovey* v. *Chase* (1863), 52 Me. 304, 83 Am. Dec. 514; *Allis* v. *Billings* (1843), 6 Metc. (Mass.) 415, 39 Am. Dec. 744; *Blinn* v. *Schwarz* (1904), 177 N. Y. 252, 69 N. E. 542, 101 Am. St. 806. But, if he had been dissatisfied, he must have acted with reasonable promptitude to regain his property; for his laches would have barred his remedy in equity. What then could he have done effectively? What course would have been open to him? What specific thing would have been required of him? It was not in his power alone to rescind; for a rescission can be consummated out of court only by the mutual agreement of the parties. The most he could have done in that regard would have been to offer to rescind. It has been held that it would have been sufficient to have given the grantee notice in writing of his (grantor's) intention not to be bound by the deeds. *Nichol* v. *Thomas, supra; Law* v. *Long* (1873), 41 Ind. 586; *Scranton* v. *Stewart* (1875), 52 Ind. 68. It has been held in many cases that a demand would be sufficient. But what should be the nature of the demand? Should the demand be merely for possession? Manifestly if possession were yielded on a

demand therefor, only a partial restoration would be accomplished; for the record title would still remain in the grantee. A complete restoration would require a reconveyance. It would seem, therefore, that a demand, if required at all, should be for full and complete restitution. It is apparent that such a demand would be fruitless unless followed by a prompt and full compliance. Of course, an unsuccessful demand might serve as notice of the grantor's intention not to be bound by the deed. But by what magic can a mere demand, made by one party and promptly rejected by the other, transform a voidable deed into a void deed— transform something into nothing? From a consideration of many cases it appears that the somewhat mysterious thing called a "disaffirmance" is nothing more or less than a notice or a demand. In a quite recent case, it is held that the purpose of the demand is to give the grantee an opportunity "to restore what he has received, without suit and costs, if he chooses." *Barkley* v. *Barkley* (1914), 182 Ind. 322, L. R. A. 1915B 678. But why deal so gently with one who acquired property by fraud? Why manifest such tender regard for one who has procured a conveyance from an insane person, knowing the grantor's mental infirmity? The law does not require it. *Barkley* v. *Barkley, supra.* Furthermore, the record in the case at bar conclusively discloses that a demand would have been utterly fruitless. With practical unanimity, the courts are now holding that in such cases relief will not be denied merely because the idle ceremony of a demand has not been performed. *Stix* v. *Sadler* (1887), 109 Ind. 254; *Burns* v. *Fox* (1887), 113 Ind. 205; *Cutsinger* v. *Ballard* (1888), 115 Ind. 93; *Jordan* v. *Jordan* (1922), 78 Ind. App. 617, 136 N. E. 866.

The attempt to distinguish the case at bar from the Barkley case must be regarded as unsuccessful. In the

case at bar, the inherent nature of the transaction, the situation of the parties, the grantee's knowledge of the grantor's presumed mental deficiency due to his extreme age, and his illiteracy, put upon the transaction the stamp of fraud. *Helbreg* v. *Schumann* (1894), 150 Ill. 12, 37 N. E. 99, 41 Am. St. 339; *Sims* v. *McLure, supra.* The rule applicable in other cases of fraud where an equitable rescission is sought, is applicable here. The offer in the complaint is sufficient. *Rohrof* v. *Schulte* (1899), 154 Ind. 183, 194. On the death of Anderson Wells, his children acquired the rights which would have been his had he been restored to sanity; and in order that they may have the conveyances set aside, they are required to do nothing more than would have been required of him had he been restored to sanity.

It is contended that by putting the mortgage on the land described in the deed to him, Henry thereby ratified the whole transaction. This contention can not be sustained. The uncontroverted testimony is that Henry did not know the facts when he made the mortgage. It is a plain inference that in making the mortgage he acted under Nelson's directions and that this feature was engineered by Nelson and his attorney. But however that may be, the amount secured by the mortgage is so small that the matter may be readily adjusted by the final decree. It conclusively appears from the record that the trial judge acted upon an entirely erroneous view of the law of the case.

The plaintiffs have established a case of constructive fraud regardless of whether the grantor was technically insane, and, as above stated, the duty then rested upon the beneficiary in the transaction to purge himself of all disparaging presumptions by competent evidence amounting to clear and unequivocal proof. This rec-

ord shows unmistakingly that the trial court adopted a wrong view of the case. The trial court has treated it as if it belonged to that class of simple cases where one has dealt fairly with an insane person, not knowing of his insanity, and the transaction being free from any taint or suspicion of fraud. But, in truth, the presumed mental deficiency (dotage) in this case is but an ingredient of the fraud.

In view of the conclusion reached in ruling on the motion for a new trial, the ruling of the trial court on plaintiffs' motion to set aside the judgment, in order that they might be permitted to adduce evidence to prove disaffirmance need not be considered.

Justice to the litigants requires a reversal. Judgment reversed, with instructions to sustain appellant's motion for a new trial.